UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA )
)
v. ) No. 2:11-cr-178-JHR
)
R. CRAIG JOHNSON, )
)
      Defendant )

*MEMORANDUM DECISION ON MOTION TO SUPPRESS*[1]

R. Craig Johnson, charged in an information with trespass on the Rachel Carson National Wildlife Refuge and taking plants on the Rachel Carson National Wildlife Refuge, in violation of 50 C.F.R §§ 26.21(a) and 27.21, Information (Docket No. 16), moves to suppress all evidence gathered by and all statements made to Mark Kerr, United States Fish and Wildlife Service law enforcement officer for the Rachel Carson National Wildlife Refuge, on May 9, 2011. An evidentiary hearing was held before me on January 11, 2012, at which the defendant appeared with counsel. The government presented one witness and six exhibits, all of which were admitted without objection. The defendant offered four exhibits, which were also admitted without objection. After both sides rested, counsel argued orally. I now make the following findings of fact and deny the motion.

## I. Findings of Fact

The Rachel Carson National Wildlife Refuge consists of 5,000 acres in a number of units or parcels on the Maine coast from Cape Elizabeth south to Kittery. Kerr, the only witness at the hearing, patrols all of the Refuge. The land on which the defendant resides is immediately

---

[1] The parties have consented to me to conduct all further proceedings in this matter, including entry of final judgment.

1

adjacent to the Refuge in Biddeford Pool. That unit of the Refuge contains approximately 150 acres. It is located at the end of Days Landing Road. A kiosk at the end of Days Landing Road and two signs immediately adjacent to the defendant's property identify the Refuge property and warn that unauthorized entry is prohibited. The defendant in the past has asked Kerr to remove the signs adjacent to his property because they interfere with the view from his property.

There had been issues in the past about a path crossing the Refuge from Days Landing Road to the ocean. That section of the Refuge has always been closed to the public. The portion of the Refuge that is adjacent to the defendant's property was privately owned before it was acquired by the Refuge.

Kerr has spoken with the defendant and his wife three or four times about the reasons why they cannot trespass on Refuge land and cannot alter the vegetation on that land. These conversations have taken place on the defendant's property, on Refuge property, on Days Landing Road, and in the defendant's home, when the defendant and his wife invited Kerr in. Kerr's patrol log would have a record of the dates of each of these conversations. The first conversation took place before April 2006. Kerr tried to educate the defendant on the reasons why encroachment on Refuge land was a concern of the Fish and Wildlife Service. During this conversation, the defendant told Kerr that he was a registered volunteer for bird counts on the Refuge. When Kerr checked later, he discovered that this was not true. In either 2005 or 2006, the defendant had mowed a path across Refuge land so that he could get to the water in his wheelchair.

On at least two occasions, other employees of the Refuge have had similar conversations with the defendant and his wife about the fact that they could not alter Refuge property.

In March 2010, a citation was issued to the defendant after he had a landscaper cut down 8 to 10 trees that were on Refuge land, chip them, and put the chips over Refuge land, after plants of the defendant's choice had been planted on that land. In March 2010, Kerr talked with the defendant and his wife for over two hours. During this conversation, the defendant told Kerr how much he loved the Refuge, that he was willing to work with employees of the Refuge, that he should have contacted the Refuge before having the work done by the landscaper, that he had done nothing wrong, and that what he had done was for the benefit of the Refuge. Kerr explained to the defendant "over and over" that the Refuge had 1,000 neighbors and that they could not make individual decisions about what was appropriate for the Refuge.

Kerr had gone to speak with the defendant and his wife in March 2010 as a result of a boundary check that had been performed for the Refuge that showed 250 incidents of encroachment on Refuge property, of which the defendant's encroachment was more egregious than most. Kerr was checking each of these encroachments by priority when he went to the defendant's home, where he was invited in after he identified himself and told the defendant and his wife why he was there.

Kerr returned to the defendant's residence a few days later to serve the citation. The defendant told him then that he was sorry and took full responsibility. His primary concern, once he learned that Kerr planned to speak with the landscaper due to his concern that the landscaper had been willing to cut on marked Refuge property, was that the landscaper not be required to pay for something that the defendant had asked him to do. Kerr told the defendant that the landscaper, nevertheless, had violated the law.

In May 2011, the Biddeford town warden called Kerr and told him that the warden had heard chain saws in the vicinity of the defendant's house. Kerr then went to the area of the

Refuge adjacent to the defendant's house where the 2010 cutting had taken place and found that four large trees had been cut down and left on the property and that approximately 40 shrubs had been dug up and left on the surface of the property. This Refuge land is directly behind the defendant's house and in his viewshed to the ocean in Biddeford Pool.

On May 9, 2011, Kerr drove to the defendant's neighborhood in his marked vehicle. As he had done on his previous contacts with the defendant, he was wearing his uniform and carrying a holstered gun, with a taser, baton, and handcuffs on his belt. He had driven to the defendant's residence previously in the same vehicle. He intended to question the defendant and his wife about the new cutting on Refuge property adjacent to their property.

As he neared the defendant's driveway, Kerr saw a Subaru Forester automobile that he knew to be registered to the defendant's wife parked at the edge of their property with its rear hatch open. He believed that the rear wheels of the car were on Refuge property. It was not where he would expect to see the car. He parked in the defendant's driveway and walked toward the car, around a corner of the house.

As he walked toward the Subaru, Kerr saw the defendant sitting on Refuge land with a bag of sticks and a hand saw and axe nearby. The defendant's wife was in the area where the trees had been recently cut, clearing brush. The back of the Subaru was full of dead and living brush. The rear wheels of the Subaru were on Refuge property. An area of grass on Refuge property had been mowed. The defendant was placing dead branches in his bag. Nearby trees had fresh cutting marks going up their trunks.

Kerr walked onto Refuge property to speak to the defendant and his wife. He told them that they were not supposed to be on Refuge property and that they were not on their own property. The defendant then told Kerr that this was only the second time he had been on Refuge

4

property since receiving the citation in 2010 and that they were only removing "the ugly stuff." Kerr responded that the "dead stuff" was part of the environment and ecosystem that the Refuge was intended to preserve.

Kerr then said that he wanted to discuss the most recent cutting involving the four trees, and the defendant said that he didn't know anything about that. Kerr walked into the defendant's yard with the defendant's wife to point out the cut area, and both the defendant and his wife said that they had not noticed any missing vegetation. The conversations lasted 30 to 45 minutes. Kerr did not touch the defendant, display any weapon, and tried to remain calm and respectful. Neither the defendant nor his wife asked Kerr to leave, declined to speak with him, or asked to speak with a lawyer. Kerr said that he was "flabbergasted" when he first saw what the defendant and his wife were doing and that he was somewhat frustrated that his previous attempts to show them why they could not engage in such activities had not been successful.

The complaint that preceded the information in this case was issued at a later time. Before it was served, the defendant called Kerr and left several messages for him, seeking permission to remove a blackberry bush that was growing over his property from the Refuge and impeding the mowing of his lawn. Kerr told the defendant that he could remove any part of the bush up to the property line. When the complaint was served, the defendant was in bed. He wanted to talk with Kerr at that time, but Kerr told him that they could not have a conversation at that time and that the defendant could call a lawyer if he wished.

Defendant's Exhibit 3 is not an accurate depiction of what Kerr saw from Days Landing Road in May 2011 when he approached the defendant's house. The line on Defendant's Exhibit 4 is not an accurate depiction of the property line between the Refuge and the defendant's property.

## II. Discussion

### A. Entry onto the Defendant's Property

The defendant contends that Kerr was required to obtain a search warrant before entering upon his property and that there is no exception to the warrant requirement for an interview or "knock and talk" visit by a law enforcement officer to a private residence. He points out that neither he nor his wife was visible from Days Landing Road, and, therefore, he concludes that the plain view exception to the warrant requirement was similarly unavailable.

The only authority cited by the defendant in support of this argument is *United States v. Jenkins*, 124 F.3d 768 (6th Cir. 1997). In that case, law enforcement officers, having received information that the defendants were growing marijuana in the area of their residence, learned by flying over the property in a helicopter that marijuana was growing in a wooded field directly behind that residence. *Id*. at 770. The officers then drove to the property, saw the female defendant standing in the back yard, and entered the back yard without a warrant. Members of the team used a gate at the back of the yard to gain access to the wooded field, where they discovered growing marijuana in various stages of development. *Id*.

The issue on appeal from the trial court's denial of the defendants' motion to suppress was whether the back yard was part of the curtilage area of the residence that is protected by the Fourth Amendment. *Id*. at 772. The Sixth Circuit ruled that it was, and excluded evidence gathered in the back yard. *Id*. at 772-74. However, the portion of the ruling that is significant for the case at hand is that the evidence seized from the fields that the officers reached by passing through the back yard was not excluded. *Id*. at 774. The conviction was upheld. *Id*.

Here, no evidence was seized from the defendant's property. The defendant was on Refuge property when Kerr saw him, and then walked through his yard to Refuge property in

order to speak with the defendant. Any physical evidence that he might have gathered, from all that appears in the record, was gathered on Refuge property. The defendant began speaking with Kerr while both were on Refuge property, although it appears that at some point during the conversation, the defendant moved onto his own property and Kerr may have done so as well.

More applicable is some of the case law cited by the government. In *United States v. Gonzalez*, 441 Fed.Appx. 404, 2011 WL 5903474 (8th Cir. Nov. 25, 2011), the Sixth Circuit noted that it had "found invasions into an area where a person holds a reasonable expectation of privacy to be lawful so long as the intrusion was justified by some legitimate reason for being present unconnected with a search directed against the accused." *Id*. at 406, \*\*2 (citation and internal quotation marks omitted). "[G]eneral investigatory procedures, such as when agents visit a residence with the intention of questioning a suspect, qualify as a legitimate law enforcement objective." *Id*. That is what happened here. Kerr approached the defendant's residence with the intention of questioning him about the recent cutting on the Refuge near the defendant's property. When he arrived, he saw the car registered to the defendant's wife parked with its back wheels apparently on Refuge property, and its rear hatch raised.

In *Gonzalez*, agents approached the defendant's residence to question her about an informant's report that she was a cocaine supplier or trafficker. *Id*. at 405, \*\*1. There were three cars in the driveway, but no one answered a knock at the front door. The officers then walked around the residence to the back door, without encountering any physical obstruction "indicating anything more than the usual concern for back-yard privacy," and, as they approached the back door, notice a 30-ton hydraulic press on the back porch. *Id*. They knew this to be a piece of equipment used to manufacture cocaine bricks. *Id.*

In *Gonzalez*, the presence of the cars in the driveway made it reasonably likely for the officers to believe that someone was in the residence who might not have heard the knock at the front door. *Id*. at 407, **3. For that reason, the court held, no constitutional violation occurred. Here, the presence of the Subaru in an unaccustomed position and apparently parked partially on Refuge land, with its hatch opened, made it reasonably likely that the two residents of the house were in the vicinity of the vehicle rather than inside the house, and Kerr's decision to walk into the back yard did not violated the Fourth Amendment.

Similarly, in *Alvarez v. Montgomery County*, 147 F.3d 354 (4th Cir. 1998), the Fourth Circuit held that "[t]he Fourth Amendment does not prohibit police, attempting to speak with a homeowner, from entering the backyard when circumstances indicate they might find him there[.]" *Id*. at 356. "[T]his circuit has permitted law enforcement officers to enter a person's backyard without a warrant when they have a legitimate law enforcement purpose for doing so." *Id*. at 358. The officers in that case had received a complaint about underage drinking and went into the defendant's back yard after seeing a sign posted in front of the house that read "Party in Back." *Id*. at 357.

The reasoning of the courts in these cases is persuasive and on point. The defendant is not entitled to suppression on this basis.

### B. Defendant's Statements

The defendant next argues that any statements he made to Kerr during the May 9 conversation must be suppressed because Kerr said to him "you're not supposed to be there," which was the practical equivalent of "you are not free to go" and because Kerr was upset. This view of custody for purposes of the requirements of *Miranda v. Arizona*, 384 U.S. 486 (1966), is far too expansive.

8

*Miranda* warnings are only necessary when a defendant is subject to custodial interrogation. *United States v. Mittel-Carey*, 493 F.3d 36, 39 (1st Cir. 2007). A court considering whether a defendant was subjected to custodial interrogation must determine whether there was a formal arrest or a restraint on freedom of movement to the degree associated with a formal arrest. *Id.* Four factors which the First Circuit has identified as informing this analysis are whether the defendant was questioned in familiar to at least neutral surroundings, the number of law enforcement officers present, the degree of physical restraint placed upon the defendant, and the duration and character of the interrogation. *Id.*

Here, the defendant was questioned in the Refuge and in his own back yard; there was only a single law enforcement officer present. No physical restraint whatsoever was placed on the defendant by Kerr. The interrogation lasted no more than 45 minutes, much of which was occupied with Kerr's attempts to explain again to the defendant and his wife the reasons why they could not alter the vegetation on Refuge property, however helpful their intentions. Although Kerr admitted on cross-examination that he felt frustrated and was upset because the defendant and his wife still apparently had not learned what he and other employees of the Refuge had been trying repeatedly to explain to them, Kerr also testified credibly that he tried at all times during the conversation to remain calm and respectful, and there is no evidence that he did not achieve this aim.

Telling the defendant that he was not supposed to be on Refuge land, which was a true statement, was in no way coercive or the equivalent of saying "you are not free to leave." Further, the defendant's second argument, that he was in custody because Kerr subjectively felt frustrated and upset, would establish a standard that flies in the face of decades of case law

holding that it is what a person in the defendant's position could reasonably and objectively perceive that determines whether he was in custody for purposes of *Miranda*.

In his closing argument, counsel for the defendant asserted, in connection with this issue, that the only reason why Kerr did not arrest the defendant was that he came off Refuge land during their conversation. This is not a correct characterization of Kerr's testimony. Kerr testified that he did not ask the defendant to move onto his own property and would have arrested the defendant only if he had continued to cut brush on Refuge property and refused a request from Kerr to stop doing so.

The defendant is not entitled to suppression of any statements he made on May 9, 2011.

### III. CONCLUSION

For the foregoing reasons, the proposed findings of fact set forth above are adopted and the defendant's motion to suppress is **DENIED**.

Dated this 23rd day of January, 2012.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge